IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Justin Terrell,                               )
                                              )    Civil Action No. 6:05-2572-JFA-WMC
                        Plaintiff,            )
                                              )    **REPORT OF MAGISTRATE JUDGE**
            vs.                               )
                                              )
Jo Anne B. Barnhart,                          )
Commissioner of Social Security,              )
                                              )
                        Defendant.            )
_____       )


This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g), 1602 and 1614(a)(3)(A) of Title XVI of the Social Security Act, 42 U.S.C. Sections 405(g) and 1381-1383c, to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to supplemental security income benefits ("SSI").


**ADMINISTRATIVE PROCEEDINGS**

On December 14, 2001, the plaintiff's mother filed an application for SSI benefits on behalf of the plaintiff, a minor at the time,[2] alleging disability beginning September 15, 1990, due to attention deficit hyperactivity disorder (ADHD), learning disabilities, behavior problems, suicidal behavior, and hearing voices. The application was

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2]The plaintiff was born on December 16, 1985, and turned 18 in 2003.

denied initially and on reconsideration.  On May 9, 2003, the plaintiff requested a hearing, which was held on June 15, 2004.  Following the hearing, at which the plaintiff, his attorney and his mother appeared, the administrative law judge considered the case *de novo* under the disability standards for both minors and adults, and on September 9, 2004, determined that the plaintiff was not entitled to benefits.  This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on July 20, 2005.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

(1)     The child was born on December 16, 1985 and is currently attending high school in an adult learning center.

(2)     The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR § 416.924(b)).

(3)     The claimant has a "severe" impairment (20 CFR § 416.924(c) and 20 CFR § 416.920(b)).

(4)     The claimant attention deficit hyperactivity disorder and residual schizophrenia does not meet or medically equal the severity of any impairment listed in Part B of Appendix 1 to Subpart P, (20 CFR §§ 416.924(d)(l), 416.925, 416.926 and 416.920(b)).

(5)     The claimant does not have an "extreme" limitation in any domain of functioning, a "marked" limitation in two domains of functioning. and does not functionally equal the severity of the listings (20 CFR §§ 416.924(d)(2) and 416.926a).

(6)     The claimant subjective complaints are considered credible only to the extent they are supported by the evidence of record as summarized in the text of this decision.

(7)     Since attaining age 18, the claimant has the residual functional capacity to perform a full range of unskilled work.

(8)     The claimant has no past relevant work (20 CFR § 416.965).

(9)     The claimant is a 'younger individual' (20 CFR § 416.963).

(10)    The claimant has 'a limited education' (20 CFR § 416.964).

2

(11)   The claimant has no exertional limitations (20 CFR § 416.945).

(12)   Considering the types of work that the claimant is still functionally capable of performing in combination with the claimant's age. education and work experience, he could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy.

(13)   The claimant was not under a "disability." as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 416.906 and 416.920(g)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## APPLICABLE LAW

In determining whether a child is eligible for Supplemental Security Income payments on the basis of disability, a three-step sequential evaluation must be completed. If the child is doing substantial gainful activity, he will be found not disabled. If the child is not doing substantial gainful activity, his physical or mental impairment(s) will be considered to see if he has an impairment or combination of impairments that is severe. If the impairment(s) is not severe, the child will be found not disabled. If the impairment(s) is severe, the claim will considered further to see if he has an impairment(s) that meets, medically equals, or functionally equals the listings. If he has such an impairment(s), and it meets the duration requirement, the child will be found disabled. If he does not have such an impairment(s), or if it does not meet the duration requirement, he will be found not disabled. 20 C.F.R. § 924. In determining whether an impairment results in limitations that functionally equal the listings, the impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id*. § 926a. Six domains, which are broad areas of functioning intended to capture all of what a child can or cannot do, are considered. These domains are: (I) Acquiring and using information; (ii)

3

Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for oneself; and, (vi) Health and physical well-being. *Id.* §926a(b)(1).

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

4

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

The plaintiff was 15 years old at the date the SSI application was filed in December 2001, and 18 years old at the time of the ALJ's decision in September 2004 (Tr. 51). He has a ninth grade education and was admitted to a "pre-GED" program in May 2003 when he was 17 years old (Tr. 58-64).

Prior to the application filing date, the plaintiff has a history of ADHD diagnosed when he was in kindergarten, and took Ritalin until age eight. His mother indicated that the medication helped with his level of attention and focus, but that it was discontinued because it disrupted his sleep (Tr. 87-88). The plaintiff's school records indicated that he received special education services for learning disabilities in the areas of written language, oral expression, and listening comprehension, although it is unclear from the record when those services began (Tr. 79). His elementary school records indicated that his performance between first grade and sixth grade varied widely from class to class (Tr. 109). The plaintiff was re-started on Ritalin in 1995 when he was in third grade, and his mother initially said it helped, but she later discontinued the Ritalin the same year because she felt he was doing "very well without it" (Tr. 144). Clinical notes dated in October 1995 indicated the plaintiff's mother "refus[ed] any services including medication" (Tr. 152). The record does not contain any evidence that the plaintiff received medical care between mid-1996 and 2000, a period of four years.

The plaintiff's junior high school records indicated that he repeated seventh grade, and his grades between 1998 and 2001 ranged between C's and F's, with a B+ in one music class (Tr. 75, 106-08). He failed proficiency tests administered in the eighth grade (Tr. 77). Assessments conducted in 2000 and 2001 indicated that he had some auditory processing deficits (Tr. 101, 104). Testing also indicated he had average intelligence, with notable deficits in the areas of attention and delinquent and aggressive behavior (Tr. 81-84). He had "low average" achievement in reading and math, and "low" achievement in written

6

language (Tr. 92-93). By eighth grade, the plaintiff still had difficulty focusing, remaining on task, and completing work (Tr. 95-98). He appeared to have good relationships with peers and adults (Tr. 97). The plaintiff's mother reported that he had difficulty staying focused on schoolwork for extended periods (Tr. 88). She also reported a significant amount of family stress, including a house fire, an out-of-state move, and two deaths in the extended family (Tr. 87-88). She said the plaintiff did chores and "[did] best with a clearly defined list," and that he liked to participate in team sports on weekends (Tr. 88).

In December 2001, the month his mother filed for benefits, the plaintiff (then age 15) presented to a mental health clinic and reported auditory hallucinations telling him to hurt himself and others. He reported depression and anxiety, but had no suicidal or homicidal plans or intent, and had logical thought progression. He was assessed with unspecified psychosis, rule out major depression with psychotic symptoms or schizophrenia. He was given Zyprexa (antipsychotic medication) and Zoloft (antidepressant medication) (Tr. 188-89, see also Tr. 173-78).

The plaintiff presented to psychiatrist Dr. John C. Dunlap on February 4, 2002, and reported a history of fighting with siblings and talking back to teachers. Dr. Dunlap noted that the plaintiff had responded "quite well" to Zyprexa and Zoloft, and that his behavior and academic performance had been better since starting the medications. Dr. Dunlap assessed unspecified psychosis that responded well to medication (Tr. 183-84).

On February 12, 2002, the plaintiff's language-development specialist completed a report in which she indicated that he had attendance problems, but that he could apply skills at an age-appropriate level if given extended time on lengthy written assignments, and could also communicate his needs, understand and follow directions, interact with peers appropriately, and interact with adults appropriately. The specialist indicated that there were no behavioral problems in class. She reported that the plaintiff was capable "if he is interested," and that at other times he fell asleep in class. She reported that the plaintiff

7

needed to be reminded to stay on task, and that he was talkative and "like[d] to be disruptive, get the laughs" (Tr. 71-72).

On March 4, 2002, the plaintiff told Dr. Dunlap that he had done quite well on medication. He said he was eating well, sleeping well, feeling better, and even liked to go to school. His affect was appropriate, and his mother was pleased with how things were going. The plaintiff said he could pay attention better in school (Tr. 185).

On April 22, 2002, the plaintiff again told Dr. Dunlap that he did fairly well if he took his medication, and that if he missed doses, he began to hallucinate (Tr. 186).

On April 23, 2002, Plaintiff presented to psychologist James N. Ruffing, Psy.D., for an evaluation in connection with his application for benefits. IQ testing revealed a verbal IQ of 81, a performance IQ of 76, and a full scale IQ of 78. The plaintiff's overall test effort was characterized as poor. He mumbled responses, and had poor attention and focus, but his memory was intact, and he could do simple calculations and serial sevens, recite the alphabet in four seconds without error, and count backward from 10 to one in three seconds without error. He reported auditory hallucinations, although Dr. Ruffing noted his reports were inconsistent. Dr. Ruffing indicated that the plaintiff's full scale IQ of 78 was an "underestimate of [his] intellectual potential," and that his actual capacity was likely to be in the low-average range. Tests showed the plaintiff read at the fourth-grade level and had a learning disability in reading. Dr. Ruffing concluded that the plaintiff's psychological dysfunction impaired his ability to remain focused and undistracted. He assessed a "psychotic disorder NOS versus schizophrenia by record with apparent symptoms continuing" (Tr. 158-61).

On June 10, 2002, the plaintiff underwent a diagnostic evaluation by speech language pathologist Charles Q. Coffey. Following testing, Mr. Coffey concluded that the plaintiff had adequate articulation; age-appropriate expressive language skills; receptive language skills that were not age appropriate and were more appropriate for a nine-year-old;

8

adequate fluency, voice, and oral speech mechanism; normal hearing; and fair behavior with possible motivational or anger problems (Tr. 162-65).

On June 26, 2002, State Agency pediatrician Dr. Donna Stroud reviewed the plaintiff's records and completed a "Childhood Disability Evaluation Form." Dr. Stroud found the plaintiff had severe impairments that did not meet, medically equal, or functionally equal the Listings (Tr. 166-69).

A discipline report from the plaintiff's school indicated that during the fall 2002 semester (during which he was repeating the ninth grade), he was suspended nine times and given detention twice for offenses such as using profanity, disturbing class, disorderly conduct, and excessive tardiness (Tr. 66-67).

The plaintiff returned to Dr. Dunlap on October 1, 2002, and reported increased sedation over the summer, and that his hallucinations returned in September. He could not remember whether he was taking medication regularly at the time or not. He reported altercations with peers and teachers at school. Dr. Dunlap reduced the plaintiff's Zyprexa dosage to decrease the sedation, and continued the Zoloft (Tr. 181).

At a follow-up visit with Dr. Dunlap on October 29, 2002, the plaintiff reported that he was still very disruptive at home and school, and that he had tried to choke another student. He said that when he failed to take his Zyprexa, his auditory hallucinations returned. Dr. Dunlap noted that the plaintiff's affect was flat and that he was unaware his behavior was abnormal (Tr. 180).

On December 2, 2002, the plaintiff reported less sedation, although he still had elements of depression. Dr. Dunlap prescribed Wellbutrin (an antidepressant) and continued the Zyprexa, noting that he was still having some of the psychotic symptoms (Tr. 179).

On December 10, 2002, the plaintiff's industrial technology teacher, Robert Browning, completed a report in which he indicated that he plaintiff had been either absent or assigned to in-school suspension for 22 days during the fall 2002 semester. Mr. Browning

9

indicated that the plaintiff had the ability to control his own behavior if he chose to do so.  He reported that the plaintiff could apply skills involving reading, writing, and math at an age-appropriate level, communicate his basic needs, carry on conversation with adults and other students, and understand and follow simple instructions with "no problems."  Mr. Browning reported that the plaintiff appropriately developed friendships and joked with others, but that he exhibited behavior problems by continually reacting to others.  He indicated that the plaintiff "always wanted to get the last word in" with his peers.  Mr. Browning indicated that the plaintiff demonstrated the ability to engage in and sustain activities for age-appropriate periods of time, although it "t[ook] time to get [him] on task" (Tr. 68-69).

In January 2003, Mr. Browning completed a questionnaire in which he reported that the plaintiff was off his medication, and that he had a number of behavioral problems in class (Tr. 105).

On January 2, 2003, Dr. Dunlap noted that the plaintiff's condition had worsened on Wellbutrin and that he continued to have auditory hallucinations and impulsive behavior.  Dr. Dunlap prescribed Paxil (an antidepressant) and discontinued the Wellbutrin.  At a follow-up visit two weeks later, the plaintiff reported side effects with Paxil, but said that he was no longer having hallucinations.  The plaintiff subsequently reported that he had made some improvements in school, and that he was able to pay attention.  His father reported that he could see "very good changes for the better," and the plaintiff's affect seemed brighter (Tr. 204-06).

On February 27, 2003, the plaintiff reported that he was doing quite well on his new regimen, no longer having auditory hallucinations, and that he felt "much more comfortable."  He ate well, slept well, had no bad dreams, and had no medication side effects.  He indicated he was not having any problems (Tr. 207).

On April 18, 2003, State Agency physician Dr. Charles M. McKenzie reviewed the plaintiff's records and completed a "Childhood Disability Evaluation Form."  Dr. McKenzie

10

found he had severe impairments that did not meet, medically equal, or functionally equal the Listings. Specifically, he found the plaintiff had "less than marked' limitations in the domains of acquiring and using information and attending and completing tasks; "marked" limitations in interacting or relating with others; and no limitation in the remaining three domains (Tr. 195). In an explanation of his findings, Dr. McKenzie noted that the plaintiff had improved with treatment, and that even giving the plaintiff the benefit of the doubt, the overall weight of the evidence showed a marked impairment in no more than one domain (Tr. 190-98).

On April 23, 2003, Dr. Dunlap noted that the plaintiff continued to do "quite well" on Paxil and Zyprexa. He was doing well in school and not having behavior problems or hallucinations. He ate and slept well. Dr. Dunlap noted that the plaintiff was 17 years old and still in the ninth grade (Tr. 208).

On July 9, 2003, Dr. Dunlap found the plaintiff was doing fairly well on his regimen, although he occasionally had outbursts for no apparent reason. For a couple of weeks, the plaintiff failed to take his medication, and wound up having extreme difficulties again, including hallucinations. Once he was back on medication, he improved (Tr. 209).

Also on July 9, 2003, Dr. Dunlap completed a "Mental Residual Functional Capacity Assessment" form in which he opined that the plaintiff was "markedly limited" in a number of specific work-related activities, including in the abilities to understand and remember detailed instructions, to carry out detailed instructions, to perform activities on a schedule, to sustain an ordinary routine without special supervision, to work in coordination with others without being distracted by them, to make simple work-related decisions, to interact appropriately with the general public, to maintain socially appropriate behavior, and to respond appropriately to changes in the work setting. Dr. Dunlap opined that the plaintiff was "moderately limited" in the ability to understand, remember, and carry out short and simple instructions, maintain attention and concentration for extended periods, and ask simple questions or request assistance (Tr. 200-02).

On September 15, 2003, Dr. Dunlap noted that the plaintiff was doing "quite well" overall and had "no complaints whatsoever." His mother was "quite satisfied with everything" and the plaintiff had "nothing in the way of psychotic symptoms" (Tr. 210).

On January 14, 2004, Dr. Dunlap noted that the plaintiff was not overtly psychotic. He discontinued the Zyprexa due to weight gain, and switched the plaintiff to Seroquel (antipsychotic medication) (Tr. 211)

On February 11, 2004, Dr. Dunlap noted that the plaintiff was not in school, but that he was going to GED classes. The plaintiff denied hearing voices (Tr. 213).

A February 30, 2004 report of a speech/language therapist indicated that the plaintiff's speech was intelligible 70% of the time, but that he had deficiencies in language development. The therapist noted that he made some progress with therapy (Tr. 198-99).

On May 14, 2004, the plaintiff presented to Dr. Dunlap's colleague, Dr. Frank Forsthoefel, and reported that he was compliant with medication. The plaintiff said that as long as he took his medication, he was free of hallucinations and free of depression, lived compatibly with his family, and got along quite well. He said he hoped to graduate from high school, and said he went to the Learning Center and played sports. He indicated he had a few friends. The plaintiff spoke logically, coherently, and relevantly, and denied any hallucinations. Dr. Forsthoefel assessed residual schizophrenia and adjusted his medications (Tr. 212).

At the June 15, 2004, hearing, the plaintiff's mother testified that he was attending an adult learning center to get his GED (Tr. 222). She indicated he was still very fidgety and could not sit still when he failed to take his medication, but that he could sit for "a long period of time" when he took his medication (Tr. 223). She indicated he blurted things out as if he had Tourette's syndrome (Tr. 224). She reported that the plaintiff hit his siblings daily, and that he could not concentrate through a whole television program (Tr. 224-25). She

said he did chores around the house, although he wandered off and came back (Tr. 226). She said that when he took his medication, he stayed focused (Tr. 229).

The plaintiff answered all questions asked by his attorney (Tr. 233-41). He said that if he took his medication, he stayed calm (Tr. 235). He said he still had concentration problems even on the medication (Tr. 235). He said he was good at sports and played football (Tr. 238). When asked about his GED classes, he said he took reading, math, and science classes, and that his lowest grade was 80 percent (Tr. 240). He said he got along well with his teachers and students (Tr. 240).

## ANALYSIS

Because the plaintiff turned 18 between the date of his application for benefits and the date of the ALJ's decision, the ALJ considered the plaintiff's claim under the Act's procedures for evaluating disability in minors and also under the Act's procedures for evaluating disability in adults. As set forth above, the ALJ found that the plaintiff had the severe impairments of attention deficit disorder and residual schizophrenia that limit his ability to work. The ALJ found that prior to his 18th birthday, these impairments did not result in an extreme limitation or marked limitations in two domains of functioning as required under the standard for establishing disability in minors. *See* 20 C.F.R. §416.924(b)-(d). Further, under the stand for evaluating disability in adults, the ALJ found that the plaintiff had the residual functional capacity to perform the full range of unskilled work despite his impairments (Tr. 22). Because he had no past relevant work, the ALJ found that the Medical-Vocational guidelines ("the Grids") directed a finding of not disabled (Tr. 22).

The plaintiff alleges that the ALJ erred by (1) failing to properly evaluate the opinion of treating physician Dr. John C. Dunlap; (2) failing to properly consider noncompliance with medications in evaluating the plaintiff's claim; and (3) failing to consider

all of the relevant evidence and state the weight given; and (4) relying on the Grids and failing to obtain vocational expert testimony.

The plaintiff first argues that the ALJ failed to properly evaluate Dr. Dunlap's opinion that the plaintiff had several marked limitations (Tr. 200-202).  Dr. Dunlap is a psychiatrist who treated the plaintiff frequently over the relevant period.  The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case.  *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination.  SSR 96-2p.  Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors:  (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion.  20 C.F.R. §404.1527(d)(2)-(5).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p, 1996 WL 374188, *5.  As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be

14

> rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

On July 9, 2003, Dr. Dunlap completed a "Mental Residual Functional Capacity Assessment" form in which he opined that the plaintiff was "markedly limited" in a number of specific work-related activities, including in the abilities to understand and remember detailed instructions, to carry out detailed instructions, to perform activities on a schedule, to sustain an ordinary routine without special supervision, to work in coordination with others without being distracted by them, to make simple work-related decisions, to interact appropriately with the general public, to maintain socially appropriate behavior, and to respond appropriately to changes in the work setting. Dr. Dunlap opined that the plaintiff was "moderately limited" in the ability to understand, remember, and carry out short and simple instructions, maintain attention and concentration for extended periods, and ask simple questions or request assistance (Tr. 200-02).

The ALJ did not mention Dr. Dunlap's opinion in his decision. The defendant argues that the ALJ "implicitly gave less weight to Dr. Dunlap's opinion of marked limitations" and "acknowledges that it would have been ideal for the ALJ to explicitly address Dr. Dunlap's opinion in the decision." However, the defendant argues "the error proved harmless because the opinion was inconsistent with other substantial evidence . . ." (def. brief 16-17). This court disagrees. Such post-hoc rationalizations are prohibited. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Because the opinion was not even mentioned, it is impossible for the court to know whether the ALJ's considered Dr. Dunlap's opinion at all. Further, it is

impossible for the court to evaluate what weight, if any, was given to the opinion, and whether the ALJ's evaluation of the opinion is in accordance with Fourth Circuit law and supported by substantial evidence.  Accordingly, upon remand, the ALJ should be instructed to evaluate Dr. Dunlap's opinion in accordance with the above-cited law.

The plaintiff next argues that the ALJ failed to apply the proper legal standard in considering the plaintiff's alleged failure to follow prescribed treatment.    Under Social Security Ruling 82-59, the Social Security Administration may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:

> 1.    The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . .; and
>
> 2.    The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
>
> 3.    Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
>
> 4.    The evidence of record discloses that there has been refusal to follow prescribed treatment.
>
> ***
> Where the treating source has prescribed treatment clearly expected to restore ability to engage in any SGA (or gainful activity, as appropriate), but the disabled individual is not undergoing such treatment, appropriate development must be made to resolve whether the claimant or beneficiary is justifiably failing to undergo the treatment prescribed.
>
> Development With the Claimant or Beneficiary--The claimant or beneficiary should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal. The record must reflect as clearly and accurately as possible the claimant's or beneficiary's reason(s) for failing to follow the prescribed treatment. Individuals should be asked to describe whether they understand

16

the nature of the treatment and the probable course of the
medical condition (prognosis) with and without the treatment
prescribed. The individuals should be encouraged to express in
their own words why the recommended treatment has not been
followed. They should be made aware that the information
supplied will be used in deciding the disability claim and that,
because of the requirements of the law, continued failure to
follow prescribed treatment without good reason can result in
denial or termination of benefits.

SSR 82-59.

The ALJ noted that "academic and psychological records reflect a pervasive
lack of medical compliance by [the plaintiff's] mother" (Tr. 17).  He further noted that he had
considered the plaintiff's subjective allegations, but did not find that the plaintiff's emotional
impairments resulted in marked functional limitations.   The ALJ stated, "The record
establishes that if the claimant is compliant with medication he is symptom free of any
maladaptive behavior and capable fo performing age and grade level appropriate work" (Tr.
22).  The defendant recognizes that the plaintiff's initial noncompliance with medication was
a decision made by his mother.  However, the defendant argues that "[i]n later years, Plaintiff
spontaneously became noncompliant for brief periods, but he always returned to his
physician for medication after his symptoms worsened.  Thus, the evidence does not show
that his impairments were so severe as to destroy his judgment about taking his medication"
(def. brief 21).  While the evidence does show that medication significantly helped the
plaintiff's symptoms, this court agrees with the plaintiff that the ALJ should have  given the
plaintiff and his mother "an opportunity to fully express the specific reason(s) for not following
the prescribed treatment." SSR 82-59. The plaintiff further argues that there is no legal basis
for imputing the noncompliance of the plaintiff's mother to the plaintiff as the general policy
of the Commissioner is not to consider a disabled child responsible for failing to follow
prescribed treatment (pl. brief 21) (citing POMS DI 23010.020[3]).   This court agrees.

---

[3]The plaintiff states that the policy is attached as Exhibit A to his brief; however, the exhibit was not filed.

17

Therefore, upon remand, the ALJ should be instructed to further develop the noncompliance issue in accordance with the above-cited law.

The plaintiff next argues that the ALJ failed to consider all of the relevant evidence and state the weight it was given. Specifically, the plaintiff argues the ALJ cited no evidentiary basis for his findings that the plaintiff had a moderate limitation in attending and completing tasks and less than marked limitations in acquiring and using information and interacting with others (Tr. 18-19). The plaintiff further argues that the ALJ ignored the opinion evidence that conflicted with his conclusions, including the opinion of Dr. Dunlap, which is discussed above, and the opinion of consulting physician Dr. Ruffing, who stated that the plaintiff's "overall attention and focus was poor" and that he appeared to have a learning disability in reading (Tr. 160). The plaintiff also notes that one state agency non-examining physician opined that the plaintiff had a marked limitation in interacting and relating to others (Tr. 192) and another indicated that the plaintiff had a marked limitation in attending and completing tasks (Tr. 196). Upon remand, the ALJ should be instructed to address these conflicts in the record.

Lastly, the plaintiff argues that the ALJ erred by relying on the Grids to find him disabled. Specifically, the plaintiff argues that because the ALJ found he had severe mental impairments, he was required to obtain vocational expert testimony. When a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may serve as guidelines. *Wilson v. Heckler*, 743 F.2d 218, 222 (4th Cir. 1984). The Fourth Circuit has recognized that "not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). The proper inquiry in such a case is "whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable." *Id*. If a nonexertional condition reduces an individual's residual functional capacity to perform sedentary work, it is inappropriate to apply the grids. The

18

question of whether a nonexertional condition interferes with a claimant's residual functional capacity to perform certain jobs is a question of fact. *Smith v. Schweiker*, 719 F.2d 723 (4th Cir. 1984).

The defendant argues that because the only nonexertional limitation was to unskilled work, it would not reduce the occupational base of jobs set forth in the Grids, and thus the ALJ properly used the Grids (def. brief 22). However, as set forth above, the ALJ found that the plaintiff had severe mental impairments characterized as attention deficit hyperactivity disorder and residual schizophrenia (Tr. 16), and these impairments caused him moderate limitation in social functioning and concentration, persistence, or pace (Tr. 22). As set forth above, it appears that the ALJ failed to consider certain relevant evidence, including the opinion of Dr. Dunlap. Accordingly, upon remand, the ALJ should re-evaluate whether the evidence of a nonexertional condition interferes with the plaintiff's residual functional capacity to perform work of which he is exertionally capable.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.


s/William M. Catoe
United States Magistrate Judge


July 17, 2006

Greenville, South Carolina